SLIP OPINION



# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–13–998

| | |
|---|---|
| JERRY WILSON, LILLIE MAXINE WILSON, and TERRY JAMES WILSON<br>APPELLANTS<br><br>V.<br><br><br>GREG WILLIAMS FARM, INC., and GREG WILLIAMS<br>APPELLEES | **Opinion Delivered** May 28, 2014<br><br>APPEAL FROM THE LAFAYETTE COUNTY CIRCUIT COURT<br>[NO. CV 2010-56-2]<br><br>HONORABLE BRENT HALTOM, JUDGE<br><br>AFFIRMED |

**DAVID M. GLOVER, Judge**

This crop–damage case returns after we dismissed an earlier appeal for lack of a final order. *Wilson v. Greg Williams Farm, Inc.*, 2013 Ark. App. 248. Jerry Wilson, Lillie Wilson, and Terry Wilson (collectively, the Wilsons) bring this appeal from the directed verdicts granted in favor of Greg Williams Farm, Inc. (GWF), and Greg Williams, individually.[1] They also argue that the circuit court erred in failing to take judicial notice of Environmental Protection Agency (EPA) documents concerning pesticides and in not finding that GWF owed them a nondelegable duty. Finding no error, we affirm the circuit court.

The Wilsons and Claude Eugene Rowe are adjacent landowners. Both own in excess of eighty acres. The Wilsons' southern boundary line is Rowe's northern boundary line. The

---

[1]Unless the context requires otherwise, we will refer to GWF and Greg Williams, individually, collectively as GWF.

Red River is the western boundary of both properties. The GWF property has its eastern boundary on the Red River directly across from the Wilson and Rowe properties.

In May 2008,[2] GWF hired Smith to apply the herbicide Surmount to its property.[3] On May 11, 2010, the Wilsons and Rowe filed suit against GWF; Williams, individually; and Donnie Smith d/b/a River Bottom Aviation for damages resulting from the spray drift of a chemical that Smith applied to the GWF property. The Wilsons contended that after the chemical was sprayed, their trees began showing signs of damage, and the State Plant Board documented chemical damage to their property. Rowe claimed his cattle died as a result of the chemical drift. The complaint asserted claims for negligence, trespass, and nuisance. The Wilsons and Rowe sought damages for restoration of their property to the pre-drift condition; discomfort and annoyance; pain, suffering, and mental anguish; compensation for the dead cattle; treble damages under Ark. Code Ann. § 18-60-102(a); and punitive damages. After Smith and GWF answered separately, the Wilsons and Rowe settled with Smith, and their claims against him were dismissed with prejudice.

The Wilsons moved for partial summary judgment as to the liability of GWF for the

---

[2]In their complaint, the Wilsons alleged that the Surmount was applied on May 11, 2008. However, the evidence showed that GWF did not purchase and take delivery of the Surmount until May 16, 2008. Jerry Wilson later testified that he was mistaken when he listed the occurrence as being on May 11, 2008. This discrepancy is not important for our analysis.

[3]The Surmount label states that it is a restricted-use pesticide. However, the label also states that it is a herbicide for the control of woody plants and annual and perennial broadleaf weeds. The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136–136y (2012) (FIFRA), creates a comprehensive scheme for the regulation of pesticide labeling and packaging. *Welchert v. Am. Cyanamid, Inc.*, 59 F.3d 69, 71 (8th Cir. 1995). FIFRA's definition of the term "pesticide" includes herbicides such as Surmount. *See* 7 U.S.C. § 136(u); *Welchert*, 59 F.3d at 71 n.1. The parties use the terms interchangeably.

negligent acts of Smith. They also filed a supporting brief. GWF responded. GWF filed its own motion for summary judgment, asserting that because the aerial application of chemicals was not ultrahazardous, it was not responsible for the negligence of Smith, the independent contractor.

The circuit court denied both motions for summary judgment. The court also stated that it needed more information in order to make a ruling regarding whether Surmount was an inherently dangerous or ultrahazardous chemical.

Shortly before trial, the Wilsons filed a motion requesting judicial notice of EPA documents concerning the pesticide 2, 4-D and the two component chemicals in Surmount. At a hearing immediately prior to trial, the court declined to take judicial notice of the conclusions in a June 2005 document for the pesticide 2, 4-D. The court did take judicial notice about the drift information for the component chemicals in Surmount.

The case proceeded to trial. The Surmount label was introduced into evidence. One of its provisions states that the chemical should not be used where surface water is present. The label also advises that avoiding spray drift at the application site is the responsibility of the applicator, but that the grower is also responsible for considering the various factors in deciding to use Surmount. Although both fixed-wing and helicopter equipment may be used to apply Surmount, fixed-wing aircraft require additional drift-mitigation measures. One such measure is to apply the largest droplets that provide sufficient coverage and control. According to the label, drift potential is lowest between wind speeds of two and ten miles per hour. However,

many factors, including droplet size and equipment type, determine drift potential at any given speed. The label also warned that it was impossible to eliminate all risks associated with use of the product.

At the conclusion of the Wilsons' proof, the court granted GWF a directed verdict. In doing so, the circuit court noted that our courts have ruled unequivocally that the aerial application of pesticides is not a dangerous occupation in and of itself. The court found that there was no evidence regarding whether Surmount is inherently dangerous. Rejecting the Wilsons' argument that the Surmount label could be used as evidence of negligence, the court described the risks discussed on the label as the manufacturer's attempt to cover itself and not to address the situation at hand. The court also found that there was no evidence that special skill was required to apply Surmount. The court concluded that neither crop dusting itself nor Surmount was inherently dangerous. The court also found that there was no evidence that either GWF or Williams, individually, was negligent.

We dismissed the Wilsons' first appeal for lack of a final order. *Wilson*, *supra*. Following remand, the circuit court entered a final judgment, and this appeal followed.

In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Buckalew v. Arvest Trust Co., N.A.*, 2013 Ark. App. 28, ___ S.W.3d ___.  A motion for directed verdict should be granted only if there is no substantial evidence to support a jury

verdict. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.*

On appeal, the Wilsons argue that the circuit court erred when it (1) denied the Wilsons' motion for partial summary judgment regarding GWF's nondelegable duty to the Wilsons; (2) granted GWF's motion for a directed verdict regarding imputed liability; (3) denied in part the Wilsons' motion for judicial notice; and (4) granted GWF's motion for a directed verdict regarding its negligence.

The premise of the Wilsons' argument is that the aerial application of the Surmount chemical is an inherently dangerous activity such that GWF can be held liable for the negligence of its independent contractor Smith, or its own negligence. We disagree.

First, contrary to the Wilsons' argument, our supreme court has held that crop dusting is no longer an inherently dangerous activity. *Little v. McGraw*, 250 Ark. 766, 467 S.W.2d 163 (1971). *Little* was a case where a low-flying cropduster struck and killed one of the landowner's employees guiding the cropduster. In an earlier crop-dusting case, the supreme court said that one who uses a chemical sprayed by airplane on his crops is not liable, in every case, to his neighbors for damage done to their crops from the chemical, and that negligence must be shown. *Burns v. Vaughn*, 216 Ark. 128, 224 S.W.2d 365 (1949); *see also Chapman Chem. Co. v. Taylor*, 215 Ark. 630, 222 S.W.2d 820 (1949).[4] The *Little* court said that "[a]viation is now

---

[4]*Burns* and *Chapman* involved the pesticide 2, 4–D. *Chapman* appears to hold that the application of 2, 4–D was an ultrahazardous activity resulting in absolute liability. In *Burns*, decided a little over a month after rehearing was denied in *Chapman*, the court appeared to hold that negligence must also be shown in a case involving 2, 4–D. Justice George Rose

so commonplace that it cannot be considered to be either inherently dangerous or ultrahazardous." 250 Ark. at 769, 467 S.W.2d at 165. Thus, the liability of GWF cannot be predicated on this ground. That leaves two other grounds for liability—the negligence of Smith in applying the Surmount chemical or the Surmount itself.

The general rule is that the employer is not liable for the negligence of an independent contractor. *McCorkle Farms, Inc. v. Thompson*, 79 Ark. App. 150, 163, 84 S.W.3d 884, 891 (2002). One exception to that rule is that the employer will not be permitted to escape liability for negligent injury to the property of another where the work to be performed is inherently dangerous. *Id*. Because crop dusting is not inherently dangerous, *Little*, *supra*, that leaves the Surmount chemical as the only basis for GWF's vicarious or imputed liability.

In the present case, the circuit court found that there was no evidence on which to base a finding that aerial application of Surmount was an inherently dangerous activity. The court noted that, unlike 2, 4-D, the Arkansas State Plant Board places Surmount in its lowest classification, requiring only that it be applied according to its label. The court cited the testimony of Greg Williams that Surmount was commonly used and that it did not involve a grave risk. The court further cited Donnie Smith's testimony that he applied Surmount in accordance with the label requirements.

---

Smith, the author of *Burns*, had dissented in *Chapman*. *Burns* was unanimous. When *Burns* and *Chapman* are read together, it is certainly a mixed legacy as to what legal principles were determined and how they were to apply to future cases. It is certainly questionable whether the *Chapman* court, although quoting the Restatement of Torts, sections 519, 520 (1938), actually approved or adopted that standard. Certainly *Burns* puts the issue of negligence back into the mix.

In their argument, the Wilsons rely on cases from the 1940s to the 1970s involving the application of ultrahazardous chemicals (2, 4-D) or other activities that were considered ultrahazardous at the time. However, the more recent pesticide cases focus on the nature of the substance being applied rather than the manner of application. For example, in *Mangrum v. Pigue*, 359 Ark. 373, 198 S.W.3d 496 (2004), the supreme court held that application of Roundup Ultra was not inherently dangerous. The court noted that Roundup Ultra is a chemical that is commonly used in the farming community and is available for sale to the general public. The court also noted that there was simply an insufficient factual basis to conclude that the application of Roundup Ultra was an ultrahazardous activity.

In *Copeland v. Hollingsworth*, 259 Ark. 603, 535 S.W.2d 815 (1976), the plaintiff's tomato crop was damaged when the defendant's property was sprayed with the herbicide 2, 4, 5-T, one of the ingredients used in Agent Orange.[5] Although the supreme court found that 2, 4, 5-T was an "inherently dangerous substance" and held that the independent-contractor rule did not apply, the court reversed the judgment in favor of the landowner because the jury was instructed on strict liability, which had not been pled. 259 Ark. at 605, 535 S.W.2d at 816.

The Wilsons attempt to distinguish *Mangrum* as being a case involving an ultrahazardous activity. While it is true that the *Mangrum* court did address whether the Roundup Ultra pesticide was ultrahazardous, it also addressed whether there was sufficient evidence of negligence to be submitted to the jury. In the present case, the Wilsons did not offer any

---

[5]Agent Orange is equal parts 2, 4-D and 2, 4, 5-T.

SLIP OPINION

testimony of malfunctioning equipment or piloting technique.[6] They did offer the testimony of Steve Bostian, an investigator with the Arkansas State Plant Board, who concluded that the Surmount did, in fact, drift outside its intended target. However, the mere fact that the Wilsons' trees died is not proof of negligence. *Mangrum, supra*. The Wilsons also argue that there is no proof that GWF or the Williams took proper precautions before Smith applied the Surmount chemical. The burden is upon the Wilsons to prove the negligence that proximately caused the injuries claimed; GWF does not have the burden of proving freedom from negligence. *Mangrum, supra*.

This brings us to the question of whether there was negligence on the part of GWF or Williams. Other than the claim that drift allegedly occurred and that the aerial application of chemicals is inherently dangerous, the Wilsons' only argument concerning negligence on the part of GWF and Williams is that GWF retained control over Smith, making him an employee, for which GWF could be held liable. They argue that GWF retained control because it "determined the who, what, when, where, and how of this aerial chemical application because he hired Smith, bought the Surmount, ordered the application done, determined where to apply, and wanted it done aerially." However, these are the types of directions one would normally give to a cropduster. What is missing is any testimony that

---

[6]The Wilsons did offer their own lay testimony concerning the wind at the time of Smith's application of the Surmount. Such testimony relative to the wind direction was held to be direct evidence of negligence of the application of the chemical. *Sullivan v. Voyles*, 249 Ark. 948, 462 S.W.2d 454 (1971). However, such negligence would be on the part of Smith, not GWF.

SLIP OPINION

GWF specified the size of the nozzles used or the airspeed at which Smith was supposed to make the application. Steve Bostian said he could not say whether Smith complied with the label requirements.

The Wilsons further argue that GWF and Williams were negligent in the selection of Smith. Both Williams and Smith testified that Smith had applied chemicals on the GWF property for several years. An employer who has previous successful experiences with an independent contractor in the performance of his work cannot be held liable on the theory of the negligent selection of the contractor. *Stoltze v. Ark. Valley Elec. Coop. Corp.*, 354 Ark. 601, 127 S.W.3d 466 (2003).

We cannot consider the issue of whether GWF owed the Wilsons a nondelegable duty, which was raised in the Wilsons' motion for partial summary judgment. As a general rule of appellate procedure, a denial of a motion for summary judgment is not subject to review on appeal, even after a trial on the merits. *Get Rid of It Arkansas, Inc. v. Hughes*, 368 Ark. 535, 247 S.W.3d 838 (2007).

We now turn to the Wilsons' argument that the circuit court erred in refusing to take judicial notice about 2, 4–D and picloram, one of the components of Surmount, as well as the fact sheet for fluroxypyr, another component of Surmount. The circuit court refused to take judicial notice of the documents about 2, 4–D; however, the court did take judicial notice of the drift information concerning both picloram and fluroxypyr. When reviewing a refusal to take judicial notice, we use the abuse–of–discretion standard. *Patterson v. United Parcel Serv.,*

SLIP OPINION

*Inc.,* 102 Ark. App. 378, 285 S.W.3d 683 (2008).

During the discussion of whether the court would take judicial notice, the Wilsons' attorney sought to compare the Surmount chemical allegedly sprayed on their property to 2, 4-D, which has been declared to be an ultrahazardous chemical. In its ruling, the court noted that judicial notice was premature because there was no evidence showing how Surmount related to 2, 4-D. The court left open the possibility that the 2, 4-D documents could be admitted if there was such testimony.

On appeal, the Wilsons argue that the accuracy of the EPA documents cannot reasonably be questioned and that they are relevant. However, that argument misses the circuit court's point because the Wilsons did not offer testimony, expert or otherwise, to show how the risks of drift in Surmount were similar to the risks found in 2, 4-D. Without such testimony, the circuit court did not abuse its discretion by refusing to take judicial notice of them under Rule of Evidence 201 or by refusing to admit the EPA documents as evidence without support from any witness. *Patterson, supra.* When the circuit court is not provided with the necessary information on which to take judicial notice, it is not error for it to fail to do so. *Hempel v. Bragg*, 313 Ark. 486, 856 S.W.2d 293 (1993).

The Wilsons also argue that, under federal law, documents published in the Federal Register "shall be judicially noticed." 44 U.S.C. § 1507. The problem with this argument is that it was not made to the circuit court. Therefore, it is not preserved for appeal. It is well settled that our appellate courts will not consider arguments raised for the first time on appeal.

*Worden v. Kirchner*, 2013 Ark. 509, \_\_\_ S.W.3d \_\_\_.

Affirmed.

GRUBER and WHITEAKER, JJ., agree.

*McMath Woods P.A.*, by: *Ross Noland*, for appellants.

*Hughes & Hughes Law Firm*, by: *Eric G. Hughes*, for appellees.